**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NOTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISON**

DR. KEITH BELL                                                    PLAINTIFF

v.                                    CIVIL ACTION NO. 3:24-CV-231-MPM-RP

LANE KIFFIN                                                       DEFENDANT

**ORDER**

      This cause comes before the court on the motion of defendant Lane Kiffin to dismiss this action pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiff Dr. Keith Bell has responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, is prepared to rule.

      It is well settled that federal copyright law permits artists who believe in good faith that their intellectual property rights have been violated to seek recovery for those violations in federal court. This court has no skepticism whatsoever towards copyright actions in general; to the contrary, it regards them as a very important tool for ensuring that the creative works of artists are not unlawfully misappropriated. With any beneficial law, however, there will always be some litigants who seek to abuse it, and this court believes that there is good reason to suspect that this case involves such a litigant. In so stating, this court notes that this case bears an extraordinary similarity to another copyright action dismissed by the Fifth Circuit in its February 2022 decision in *Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313, 318 (5th Cir. 2022). In that action, the Fifth Circuit dismissed an action by the very same plaintiff in this case, based on an almost identical quotation on social media of an inspirational passage from his book

*Winning Isn't Normal.* In *Eagle Mountain,* the Fifth Circuit described plaintiff's book as follows:

> In 1982, Bell published *Winning Isn't Normal*, a 72-page book that provides strategies for success in athletics. Bell continues to market and sell *Winning Isn't Normal* through online retailers and his personal website, where he also offers merchandise, including t-shirts and posters that display the passage that was quoted in the tweets.
> That passage, which Bell calls the WIN passage, is separately copyrighted. Bell offers licenses for its use. The passage reads:
>> Winning isn't normal. That doesn't mean there's anything wrong with winning. It just isn't the norm. It is highly unusual.
>> Every competition only has one winner. No matter how many people are entered, only one person or one team wins each event.
>> Winning is unusual. And as such, it requires unusual action.
>> In order to win, you must do extraordinary things. You can't just be one of the crowd. The crowd doesn't win. You have to be willing to stand out and act differently.
>> Your actions need to reflect unusual values and priorities. You have to value success more than others do. You have to want it more. Now take note! Wanting it more is a decision you make and act upon—not some inherent quality or burning inner drive or inspiration! And you have to make that value a priority. You can't train like everyone else. You have to train more and train better.
>> You can't talk like everyone else. You can't think like everyone else. You can't be too willing to join the crowd, to do what is expected, to act in a socially accepted manner, to do what's "in." You need to be willing to stand out in the crowd and consistently take exceptional action. If you want to win, you need to accept the risks and perhaps the loneliness ... BECAUSE WINNING ISN'T NORMAL!

*Eagle Mountain*, 27 F.4th at 318.

This case arises from Kiffin's March 20, 2022 tweet of the exact same passage quoted above, and, since an image of that tweet is attached to the complaint, it is appropriate that this court reproduce it here. In his tweet, Kiffin posted what appears to be a photocopy of the WIN passage, and he did not otherwise offer commentary or elaborate upon its content in any manner. Specifically, Kiffin's tweet was as follows:





[Exhibit 3 to the Complaint].

This court observes that, after quoting this same passage in *Eagle Mountain*, the Fifth Circuit noted plaintiff's predilection for suing public schools and other non-profit entities, in a manner which many would regard as considerably less than inspirational. Specifically, the Fifth Circuit wrote that:

> Bell has another revenue stream. He zealously seeks out and litigates unauthorized uses of the WIN Passage. Between 2006 and 2017, Bell filed over 25 copyright lawsuits. Most of the defendants were public schools or nonprofits, which published the WIN passage on social media.

*Id.* at 318. In affirming the district court's award of attorneys' fees against Bell, the Fifth Circuit had very harsh words for his litigation practices, writing that:

> Bell is not the typical copyright plaintiff seeking "a fair return for [his] creative labor." *See Twentieth Cent. Music Corp. v. Aiken*, 422 U.S. 151, 156, 95 S.Ct. 2040, 45 L.Ed.2d 84 (1975). He has a long history of suing public institutions and nonprofit organizations over de minimis uses of his work. Taking these cases into account, the district court reasonably concluded that Bell is a serial litigant, who makes exorbitant demands for damages in hopes of extracting disproportionate settlements. This case is another in the line. The school shared a single page of Bell's work with fewer than 1,000 online followers and immediately removed the posts upon request. Bell was unable to identify any actual financial injury associated with that use but brought suit anyway. Attorney's fees were thus an appropriate deterrent, both with respect to Bell and other copyright holders who might consider a similar business model of litigation. See id. at 168, 95 S.Ct. 2040.

*Eagle Mountain*, 27 F.4th at 326.

While there was clearly a strong air of disapproval in the Fifth Circuit's description of plaintiff's serial litigation practices, that court nevertheless gave his copyright arguments thorough consideration before ultimately concluding that the fair use doctrine protected the reposting on social media of the same "Winning Isn't Normal" passage which is at issue here. Congress codified the fair use doctrine in the Copyright Act of 1976 and listed four factors that courts should consider when applying it:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

In applying these factors in *Eagle Mountain*, the Fifth Circuit summarized its holding as follows:

> Time to tally up the scorecard. The first and fourth fair-use factors favor the school district, the second narrowly favors Bell, and the third is neutral. In both their number and

importance, the statutory factors show that the school's tweets were fair use. This conclusion comports with the "ultimate test of fair use": whether copyright law's goal of promoting creativity would be better served by allowing the use than preventing it. *Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 141 (2d Cir. 1998). The complaint does not suggest that the school's use had any cognizable, adverse impact on Bell. What it does make clear is that the softball team and flag corps used Bell's work in good faith, for no commercial gain, and for the laudable purpose of motivating students to succeed. We cannot see how the creative arts would be better served by permitting Bell's suit to proceed. Because a successful fair-use defense "appears on the face of the complaint," and Bell can "prove no set of facts" that would overcome it, the district court properly dismissed the case.

*Id.* at 325–26.

This court notes that plaintiff appears to have an exceedingly high opinion of the literary value of his WIN passage, proclaiming on his website that "[t]he separately copyrighted Winning Isn't Normal passage ("WIN") is likely the most read & widely used literary work in history!" *See* https://winningisntnormal.com/. This extraordinary assertion, with which Shakespeare, Tolstoy and Faulkner might take issue, frankly causes this court to wonder whether it is dealing with a litigant whose feet are firmly planted on the ground. While this court might ordinarily suspect that such an assertion was made in jest, there is nothing funny about the dozens of lawsuits which plaintiff has filed against numerous entities which, as the Fifth Circuit noted in *Eagle Mountain*, were mostly "public schools or nonprofits." *Id.* at 318. Moreover, while the defendant in this case, a wealthy and famous football coach, is considerably less of an "underdog" figure than many of the other entities that plaintiff has sued, Kiffin does have the advantage of being a defendant living in this circuit who made the allegedly offending Twitter post *after* the Fifth Circuit had issued its opinion in *Eagle Mountain*.

This court notes that, following the Fifth Circuit's decision in *Eagle Mountain*, plaintiff appears to have simply shrugged his shoulders, loaded his covered wagon and taken his traveling litigation show to the next courthouse. In December 2022, plaintiff's show made a stop in

Wisconsin where, as in *Eagle Mountain*, a district court found his litigation tactics to be sufficiently abusive to award attorneys' fees against him. Specifically, the Wisconsin district court wrote that:

> Here, taking all relevant circumstances into account, I conclude that the purposes of the Copyright Act are clearly furthered by awarding fees to defendants. Bell's suit does not in any way further the Act's goal of encouraging authors' creations. Instead, it is a product of Bell's practice of trawling the Internet in search of *de minimis* and harmless references to the WIN passage. It is immensely clear that the retweet caused no harm to Bell whatsoever and could not possibly deter authors from creating new works. In fact, Bell's behavior is akin to that of a copyright "troll": one who "bring[s] strategic infringement claims of dubious merit in the hope of arranging prompt settlements with defendants who would prefer to pay modest or nuisance settlements rather than be tied up in expensive litigation." *Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1097 (7th Cir. 2017). Bell, of course, could not possibly earn legitimate revenue by licensing his work to school coaches who wish to celebrate or inspire student athletes by retweeting Twitter posts that reference the WIN passage. As noted above, the transaction costs associated with such licensing would be prohibitive. So Bell instead lies in wait and springs lawsuits on school districts whose employees retweet the passage, hoping that the school district will choose to settle rather than incur the costs of litigation. The Seventh Circuit has explicitly recognized that this kind of behavior is "far removed" from the goals of copyright law. *Id.* The Fifth Circuit has likewise recognized that Bell's "business model of litigation" is improper. *Eagle Mountain*, 27 F.4th at 326.

*Bell v. Milwaukee Bd. of Sch. Directors*, 2022 WL 18276966, at *10 (E.D. Wis. Dec. 21, 2022).

Given plaintiff's litigation history, it is unsurprising that he urges this court to avert its gaze from the results he has obtained in recent lawsuits and to concentrate solely upon the allegations of this case. Specifically, plaintiff argues that:

> Kiffin devotes a substantial portion of his brief to discussing Dr. Bell's litigation history, even attaching a PACER printout to his motion. (Doc. 25 at 3; Doc. 24-2.) Aside from going beyond the pleadings, Kiffin's ad hominem attacks are irrelevant to the issues before the Court and unwittingly betray the dearth of merits-based arguments at Kiffin's disposal.

[Brief at 3, note 3]. This court strongly disagrees with plaintiff's assertion that it should ignore the fact that he has recently been sanctioned with attorneys' fees in two very similar actions and concentrate solely upon his allegations in this case. In so stating, this court emphasizes that, in

*Eagle Mountain*, the Fifth Circuit did not simply comment upon the merits of Bell's arguments in that case, rather, it commented in a quite negative manner upon plaintiff himself. To reiterate, the Fifth Circuit wrote that:

> Bell is not the typical copyright plaintiff seeking 'a fair return for [his] creative labor.' * * * He has a long history of suing public institutions and nonprofit organizations over de minimis uses of his work. Taking these cases into account, the district court reasonably concluded that Bell is a serial litigant, who makes exorbitant demands for damages in hopes of extracting disproportionate settlements.

*Id.* at 326.

The Fifth Circuit in *Eagle Mountain* thus specifically praised the district court in that case for refusing to do what plaintiff urges this court to do here, namely engage in a myopic review of the allegations in this case without taking note of the litigation results he has obtained in very similar cases. Once again, the Wisconsin district court made the same evaluation of plaintiff's litigation tactics as the Fifth Circuit, comparing him to a "copyright 'troll' [] who 'bring[s] strategic infringement claims of dubious merit in the hope of arranging prompt settlements with defendants who would prefer to pay modest or nuisance settlements rather than be tied up in expensive litigation.'" *Milwaukee,* 2022 WL 18276966, at *10.

Having now seen plaintiff's traveling litigation show make a stop in its courthouse, this court is not required to ignore the facts that 1) reviews of that show are filtering in from surrounding communities, and 2) those reviews are not at all positive. As quoted above, the Fifth Circuit in *Eagle Mountain* noted that "[t]he fair-use doctrine balances the 'inherent tension' between copyright's interests in protecting author's works and permitting others to reference them in cultural conversation." *Id.* at 321. It is thus apparent that half of the fair use doctrine's balancing test involves an evaluation of the legitimacy of the author's interest in protecting his own intellectual property, and, that being the case, it seems entirely proper to consider the

findings of other courts regarding the legitimacy of plaintiffs' prior claims arising out of the same WIN passage at issue here.

This court further notes that, even if it were to (improperly) engage in a narrow review of plaintiff's allegations and litigation practices in this case, it would still conclude that they support a finding of bad faith. In so stating, this court observes that, in his original complaint, plaintiff clearly gave the impression that, in tweeting the WIN passage, Kiffin was acting in furtherance of his official duties as Ole Miss's head football coach. Specifically, plaintiff alleged in his original complaint that:

> 27. Kiffin's annual base coaching salary at the University of Mississippi exceeds $8 million.
> 28. The Southeastern Conference is notoriously competitive, and head-coaching jobs at Southeastern Conference schools are notoriously difficult to keep.
> 29. Both fans and school leaders at the University of Mississippi expect Kiffin to build and maintain a winning football team.
> 30. Kiffin knows that his job security—and his accompanying compensation—depend on winning.
> 31. In order to win, Kiffin knows that he must recruit the best possible players, using all available means.
> 32. As Kiffin explained at a recent press conference, "We got to coach better, but we as coaches got to recruit better in our thinking and evaluations and so forth."
> 33. Social media is a key recruitment tool for Kiffin.
> 34. As Kiffin stated during an interview with CBS Sports:
>> We walk into homes or families come here to visit and almost the first thing every time – a lot of times by a parent – is 'we love your Twitter, we love following you, it's awesome. We feel like we know you, even though we haven't met you. And to me, how much money could you pay for that in recruiting, to have someone feel like they know you when they've never met you?

[Complaint at 3-4].

Soon after this complaint was filed, defendant filed a motion to dismiss in which he noted that the Fifth Circuit (apparently alone among the federal circuits) recognizes the qualified immunity defense in copyright cases. *Chavez v. Arte Publico Press*, 59 F.3d 539 (5th Cir. 1995), *vacated on other grounds sub nom. Univ. of Houston v. Chavez*, 517 U.S. 1184, 116 S.Ct. 1667,

134 L.Ed.2d 772 (1996).  A Michigan district court has likewise cited *Chavez* as the sole federal

circuit court decision finding the doctrine of qualified immunity to be applicable in the copyright

context, *see Reiner v. Canale,* 301 F. Supp. 3d 727, 740 (E.D. Mich. 2018), and, in his briefing,

plaintiff does not contest that this is, in fact, the law in this circuit.

      For its part, this court believes that defendant should prevail in this case even without

resort to a qualified immunity defense, based solely upon the operation of the fair use doctrine.

That being the case, this court does not find it necessary to engage in an extensive qualified

immunity analysis here.  Nevertheless, this court believes that plaintiff's *reaction* to defendant's

assertion of a qualified immunity defense is quite revealing, since he appears to have tied himself

in knots trying to reconcile his original allegation that Kiffin tweeted the WIN passage in order

to recruit football players to the University of Mississippi with the arguments he has found it

necessary to make in response to the qualified immunity defense raised by defendant.

      Indeed, soon after defendant raised his qualified immunity defense, plaintiff filed an

amended complaint in which he alleged for the first time that "when Kiffin made this Twitter

post, he did not act within the scope of his authority on behalf of the University of Mississippi."

[Amended complaint at 4].  This strikes this court as being a rather extraordinary allegation,

considering that, as quoted above, the basic theory of plaintiff's original complaint was that, in

making his tweet, Kiffin's motivation was to help the University of Mississippi recruit players

and win football games.  Needless to say, Ole Miss hired Kiffin for just that purpose, and this

court agrees with plaintiff's original assertion that, in a general sense, defendant's social media

presence sought to further that purpose.   Of course, this does not necessarily mean that every

single Twitter post made by Kiffin should be deemed to be within the scope of his duties as head

football coach, but this court notes that the WIN Passage was all about "winning" and what is a football coach hired to do, if not to win?

Having said that, this court notes that the U.S. Supreme Court stated in a very recent decision that many social media accounts are properly regarded as "mixed use" accounts, which may include either personal or official posts, depending upon their nature. Specifically, the Supreme Court wrote that:

> Had Freed's account carried a label (e.g., "this is the personal page of James R. Freed") or a disclaimer (e.g., "the views expressed are strictly my own"), he would be entitled to a heavy (though not irrebuttable) presumption that all of the posts on his page were personal. Markers like these give speech the benefit of clear context: Just as we can safely presume that speech at a backyard barbeque is personal, we can safely presume that speech on a "personal" page is personal (absent significant evidence indicating that a post is official). Conversely, context can make clear that a social-media account purports to speak for the government—for instance, when an account belongs to a political subdivision (e.g., a "City of Port Huron" Facebook page) or is passed down to whomever occupies a particular office (e.g., an "@PHuronCityMgr" Instagram account). Freed's page, however, was not designated either "personal" or "official," raising the prospect that it was "mixed use"—a place where he made some posts in his personal capacity and others in his capacity as city manager.

*Lindke v. Freed*, 601 U.S. 187, 201–02, 144 S. Ct. 756, 769 (2024). In light of this holding, it appears to this court that deciding whether a particular social media post was made on behalf of a governmental employer can give rise to difficult and thorny issues, so much so that it prefers to decide this case based upon much clearer copyright principles. For the record, however, this court tends to believe that a Twitter post about "winning" which was written by Kiffin on an account which clearly identifies him as the head football coach of the University of Mississippi is most likely one which was made on behalf of his employer.

Once again, this court finds the fair use issues to be dispositive, and it therefore deems it unnecessary to address the thornier qualified immunity issues. Still, the manner in which plaintiff has asserted or de-emphasized factual allegations based upon his evolving

understanding of the governing legal standards clearly lends itself to even greater skepticism regarding his good faith.  After all, the facts of the case should be the facts, regardless of what the law says, or so it seems to this court.  Moreover, while plaintiff did support his amended complaint with specific allegations that Kiffin made his post as part of, *inter alia*, a "personal effort to enrich himself by [] bolstering his reputation and image as a compelling, paid motivational speaker," this allegation seems to be based upon nothing more than plaintiff's own opinion regarding defendant's motivation in making the tweet.  Indeed, at no point in the amended complaint does plaintiff point to anything in Kiffin's quotation of the WIN passage which would objectively support a conclusion that he was trying to drum up interest in a motivational speaking "side hustle."  Furthermore, plaintiff himself did not see fit to make this allegation until the assertion of a qualified immunity defense made it legally expedient for him to do so.  This court believes that arguments of convenience such as these would lend themselves to skepticism in any case, but they are particularly damaging in the context of a plaintiff whose good faith leading into this lawsuit was already in very serious doubt.

In light of the foregoing, this court concludes that there is even greater cause to doubt plaintiff's good faith in filing this and other similar actions than when the Fifth Circuit in *Eagle Mountain* identified him as "a serial litigant, who makes exorbitant demands for damages in hopes of extracting disproportionate settlements."  *Id.*  This has implications for this court's consideration of the fair use doctrine, since the Fifth Circuit in *Eagle Mountain* approvingly quoted a Nevada district court opinion for the proposition that "courts also look at the propriety of the plaintiff's conduct when assessing [the defendant's] good faith" under the first prong of the fair use standard  *Id.* at 323, fn. 2, citing *Field v. Google Inc.,* 412 F. Supp. 2d 1106, 1122 (D. Nev. 2006).   It seems entirely appropriate that the Fifth Circuit would have done so, since the

fair use standard is, at its heart, a *balancing* test which seeks to arrive at a "happy medium" between the legitimate interests of the author and the interests of the public in the free exchange of ideas.

This court further believes that, when a plaintiff's claimed interest in protecting his intellectual property rights in a particular work has been repeatedly found by federal courts to be of a bad faith nature, it is entirely appropriate that courts in subsequent actions consider this fact in making their rulings. This court believes this to be appropriate not only based on those courts' interests in correctly applying the fair use factors, but also as a judicial defense mechanism to prevent litigants from using the federal courts as a dumping ground for their abusive lawsuits. Indeed, this court submits that preventing the federal courts from being used as a forum for abusive shakedown lawsuits is essential for the integrity of the federal judiciary as a whole and for public confidence in it. In this vein, this court notes that the Fifth Circuit has held that "[a] district court may bar a vexatious litigant from filing future civil rights complaints unless she seeks the prior approval of a district or magistrate judge." *Potts v. Texas*, 354 F. App'x 70, 71 (5th Cir. 2009), citing *Murphy v. Collins*, 26 F.3d 541, 544 (5th Cir.1994). This court is not suggesting that plaintiff has reached this point with his WIN passage lawsuits (yet), but the existence of this authority makes it clear that federal courts are not required to ignore prior findings of abusive litigation practices by other judges in evaluating the merits of a particular claim.

With the foregoing considerations in mind, this court will turn to the merits of the case. In doing so, this court emphasizes that the Fifth Circuit in *Eagle Mountain* already considered the elements of the fair use doctrine as it relates to the very same passage at issue in this case, and, that being the case, it is impossible for this court to improve upon holdings which are, by

their very nature, binding precedent in this circuit. That being the case, this court will not repeat the Fifth Circuit's fair use analysis in *Eagle Mountain* in full. This court does wish, however, to emphasize the Fifth Circuit's observation that the fourth and last copyright factor is "undoubtedly the single most important element of fair use." *Id.* at 324, citing *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 566, 105 S. Ct. 2218, 2233 (1985).

This court believes that there is a potential for the last factor in any legal standard to get lost in the shuffle, and, since it is the most important factor in this case, it will address it here at the outset. Once again, this fourth factor is the "effect of the use upon the potential market for or value of the copyrighted work," and, in applying this factor, the Fifth Circuit wrote in *Eagle Mountain* that:

> Bell does not allege that he actually lost any revenue due to the school's use of the passage. Instead, his complaint contends that widespread use of the WIN Passage on social media could reduce "the incentive to purchase *Winning Isn't Normal* or related merchandise." We do not see a plausible economic rationale to support Bell's assertion that widespread tweeting of the WIN passage would undermine the value of his copyright. *See Twombly*, 550 U.S. at 566–68, 127 S.Ct. 1955 (considering market realities in evaluating whether a claim is plausible). The tweets do not reproduce such a substantial portion of *Winning Isn't Normal* "as to make available a significantly competing substitute" for the original work.

*Id. at* 324–25.

In his brief, plaintiff attempts to distinguish this case from *Eagle Mountain*, writing that:

As alleged in the FAC, Kiffin's unauthorized copying "usurped at least a portion of the market for the Copyrighted Works" by "causing the unlawful distribution of the Copyrighted Works to over 500,000 of Kiffin's followers" and over "400 retweets" resulting in "300,000 additional distributions." (Doc. 22 ¶¶ 49-51.) It is certainly "plausible" that Kiffin's unauthorized copying undermined the market—or even a likely to be developed market—for fellow motivational speakers to license the Copyrighted Works for use in online promotion their motivational-speaking careers. At the very least, this is a fact issue that requires discovery and cannot be resolved on the pleadings.

[Brief at 11]. This argument is non-responsive to the Fifth Court's holding in *Eagle Mountain*, namely that the allegedly infringing "tweets do not reproduce such a substantial portion of *Winning Isn't Normal* 'as to make available a significantly competing substitute' for the original work." *Id.* That is equally true in this case, and plaintiff's reliance upon defendant's large number of Twitter followers ignores the fact that the Fifth Circuit specifically rejected the notion that even "widespread tweeting of the WIN passage would undermine the value of his copyright." *Id.* As in *Eagle Mountain*, Kiffin merely tweeted one paragraph out of an entire book, and it is simply not plausible to this court that because of that tweet, even a single individual who might have otherwise purchased plaintiff's book decided not to do so.

In applying the fourth factor, the Fifth Circuit specifically rejected plaintiff's proof of marketing impact, writing that:

> Bell also alleges that the tweets might impact his ability to license similar uses of the WIN Passage. But we cannot recognize a "theoretical market for licensing the very use at bar." *Swatch Group Mgmt. Servs., Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 91 (2d Cir. 2014) (quoting 4 NIMMER ON COPYRIGHT § 13.05(A)(4)). To weigh any possible effect on licensing, we must first find it plausible that there is a "traditional, reasonable, or likely to be developed market[ ]" for licensing the kind of use at issue. *See Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994); * * * Bell says he offers licenses for the WIN Passage. Yet despite being embroiled in litigation for years, Bell is unable to allege that anyone has ever purchased a license before posting the WIN Passage on social media—much less a public school district, which has no commercial interest in its online presence. Even in his brief, Bell's only authority that "such a market exists" is his own "filing of at least 26 copyright infringement lawsuits" and obtaining settlements "from at least 90 different alleged infringers." Bell's aggressive efforts to litigate, no matter how successful, are not indicative of a "traditional" or "reasonable" market for his work. * * * Absent any plausible allegation that public schools would willingly pay to tweet the WIN Passage, Bell's licensing concerns "are purely speculative." *See Narell*, 872 F.2d at 914.

*Id.* at 325.

The Fifth Circuit thus found that Bell had been unable to demonstrate any real licensing market for his quote, and plaintiff's reliance upon Kiffin's alleged motivational speaking "side

hustle" does not support a different conclusion here. Indeed, defendant notes in his reply brief that "Bell has not alleged he has ever licensed the passage for use on social media by *anyone*, much less motivational speakers," [reply brief at 8] and this observation is certainly an apt one. Indeed, every aspect of plaintiff's "motivational speaking" theory strikes this court as being speculative in the extreme, and he offers no specific factual allegations relating either to Kiffin's intent in making the tweet or to any harm to his ability to market the quote to other motivational speakers.

Using this court's judicial experience and common sense, it seems clear that the *actual* income stream which plaintiff has found for his WIN passage is by using it as a basis for shakedown lawsuits in which he seeks to obtain settlements from defendants who made the mistake of tweeting a post from an individual who incorrectly regards himself as the author of "the most read and widely used literary work in history." *Id.* This is, however, an income stream based upon an abuse of the judicial process, and this is an abuse which, this court believes, the federal courts have an obligation to prevent. That being the case, this court does not believe that it is required to assign plausibility to bare allegations by a known abusive litigant which were made under procedurally questionable circumstances. Abusive litigation practices aside, absolutely nothing in Kiffin's tweet of the WIN Passage indicates that he had his motivational speaking "side hustle" in mind in making it, and this court does not regard this as constituting a basis for distinguishing this case from the Fifth Circuit's finding that the fourth fair use factor works against plaintiff. As in *Eagle Mountain*, plaintiff has failed to establish that there even *is* a licensing marketplace for his WIN Passage among motivational speakers, and this court therefore finds that the crucial fourth fair use factor favors defendant in this case.

Having addressed the most important factor first, this court now turns to the first fair use factor, which inquires into "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." In *Eagle Mountain*, the Fifth

Circuit addressed the defendant's good faith in the context of this finding, although, once again, it specifically endorsed the consideration of the plaintiff's own bad faith in considering the first fair use factor as well. *Id.* at 323, fn. 2. This court has already discussed plaintiff's bad faith at length, and it will accordingly consider Kiffin's good faith, or lack thereof. In making its observations in this regard, this court will begin with the fact that Kiffin's tweet of the WIN Passage involved him posting what was quite obviously a *photocopy* of a *printout* of the quote. This court regards this fact as significant, since, it believes, any reasonable person reading the tweet would assume that Kiffin was quoting someone else's words, rather than presenting his own thoughts. Indeed, it seems clear to this court that when someone is tweeting their own thoughts on a particular matter, they generally type those words themselves, rather than posting a photocopy of a printout of the words.

Given this fact, this court believes that anyone reading Kiffin's tweet would assume that this was simply him saying, in effect, "somebody said this, and I thought it was worth sharing." This strikes this court as being the sort of contribution to the exchange of ideas which copyright law should be very hesitant to find unlawful, particularly when the quote in question is of such a harmless and non-commercial nature as the WIN Passage. Certainly, it would have been preferable for Kiffin to have credited Bell with authorship of the quote, but it notes that the defendant in *Milwaukee* also failed to cite plaintiff as the author, *Milwaukee*, 2022 WL 18276966 at *2, yet this did not prevent the district court in that case from ruling in favor of the defendant and assessing attorneys' fees against plaintiff. Moreover, this court believes that the sharing of an inspirational or uplifting quote is something which many Americans would find to represent an appropriate, or even laudable, use of social media, even if the poster is unable to remember

exactly who said it.  This court further believes that courts should be very hesitant to find that, by posting an inspirational quote in this manner, a social media poster has violated copyright law.

In arguing that Kiffin acted in bad faith, plaintiff emphasizes his allegation that, in 2016, Kiffin took down a tweet of the WIN Passage after he sent him a cease-and-desist letter. [Complaint at 3].  Accepting this allegation as true, plaintiff's problem with seeking to assign bad faith to Kiffin in this regard is that the Fifth Circuit issued its opinion in *Eagle Mountain* shortly before defendant tweeted the WIN passage a second time in 2022.  That being the case, this court believes that a reasonable person in Kiffin's position who cared to research the issue would have concluded that he had every legal right to re-tweet the WIN Passage, at least in this circuit.  This makes it very difficult for any federal court to assign bad faith to him in this regard, since that would amount to that court saying that an individual acted in bad faith for doing something which the relevant federal appellate court had already said he had a right to do.  This court notes that, in the qualified immunity context, federal courts routinely use the existence of such federal precedent to excuse actions taken by police officers and other § 1983 defendants, even if there is a fictional quality to the notion that those officers actually read federal appellate court decisions.  Thus, even though this court may doubt that Kiffin is an avid reader of the Fifth Circuit's hand-down lists, the same could be said about every other state or local employee who comes before it in qualified immunity cases.  Nevertheless, federal courts routinely use the existence of prior federal precedent in evaluating qualified immunity defenses, and this court can discern no reason why a different rule should apply in this context.

That brings this court to the question of any economic motivation or benefit which Kiffin may have had in making the tweet.  This court acknowledges that, to the extent that financial gain may have been defendant's motivation in making the tweet in question, then this would

render his conduct less worthy of protection under the first fair use factor than if he were simply making a contribution to the public discourse or to inspire his and other players to greater efforts. This court further acknowledges that plaintiff's allegations in this regard are worthy of serious consideration, since there is, no doubt, a great deal of money sloshing around college football these days, and a not-inconsiderable portion of that money has ended up in Kiffin's pockets. Such is the nature of his profession – to borrow from Mr. Bell's WIN Passage, college coaches "reflect unusual values and priorities." This court has therefore given serious consideration to plaintiff's allegations in this regard, but, even having done so, it finds his claims in this regard to be highly speculative and implausible.

Once again, plaintiff provides two possible economic motivations for Kiffin to have made the tweet in question, namely to recruit players to Ole Miss and to drum up business for his motivational speaking side gig. There is no factual support whatsoever for either of these allegations based upon the manner in which Kiffin presented the tweet. In so stating, this court reiterates that, by posting a photocopy of the quote, Kiffin clearly appeared to be signaling that he was sharing someone else's words, rather than providing his own thoughts. Moreover, defendant simply quoted the passage in question, and he offered no additional context to it which might support plaintiff's speculation regarding his motivation.

In the court's view, plaintiff would have a stronger claim if Kiffin had introduced the quote with words such as "come play for me, and you'll get motivational coaching like this!" or "come to my motivational seminar, and you'll hear inspirational messages like this!" In reality, plaintiff offers nothing more than his own speculation regarding Kiffin's motivations, and this court believes that courts should be hesitant to hold contributors to the public discourse liable based upon such speculation, even in cases where the plaintiff appears to be acting in good faith.

Once again, plaintiff has been repeatedly found by federal courts to have acted in *bad* faith in filing his WIN passage lawsuits, and this fact makes it far more inappropriate to assign plausibility to the bare allegations of such a plaintiff, made under procedurally questionable circumstances. This is particularly true when, to reiterate, plaintiff is unable to demonstrate that he suffered any real economic harm as a result of Kiffin's actions. This court therefore concludes that the first fair use factor favors defendant in this case.

With regard to the second fair use factor, relating to "the nature of the copyrighted work," this court finds that the nature of the WIN Passage has not changed since the Fifth Circuit's ruling in *Eagle Mountain.* That being the case, this court concludes that the WIN passage, while hardly an earth-shattering bit of insight, does constitute a work of creativity which a number of coaches and teams have deemed worth sharing. That being the case, this court will simply echo the Fifth Circuit's finding in *Eagle Mountain* that:

> The second factor goes to Bell. But it is a meager victory. The nature of the work is widely considered the least significant fair-use factor. *See Authors Guild v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015); *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1402 (9th Cir. 1997); Patry § 7:5. And Bell carries it by a narrow margin.
> C

*Id.* at 323.

That leaves only the third fair use factor for this court's consideration, and, once again, this factor inquires into "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." *Id.* As to this factor, this court finds that there is no material difference between the facts which confronted the Fifth Circuit in *Eagle Mountain* and those here. As to this factor, the Fifth Circuit concluded that "[t]he school quoted a small excerpt from Winning Isn't Normal, which was already freely available to the public. As a result, the third factor is neutral." *Id.*

In addressing this third factor, plaintiff has chosen to play it coy in his briefing, emphasizing that, while the Fifth Circuit noted that the complaint in *Eagle Mountain* specifically alleged that the WIN Passage was freely available online, *id.* at 324, his complaint in this case contains no such allegation. Specifically, plaintiff writes in his brief that:

> Kiffin nonetheless argues [the third] factor is "neutral" because Dr. Bell made the WIN Passage "freely accessible" through authorized images he posted online. (Doc. 22 at 10 (citing *Eagle Mt. Saginaw Indep. Sch. Dist.,* 27 F.4th 313 at 324).) The FAC, however, never alleges that, at the time Kiffin copied the WIN Passage in 2022, freely accessible, authorized images of the WIN Passage were available online. (*See* generally FAC.) Kiffin asks the Court to assume that the factual allegation in Eagle Mountain Saginaw that the WIN Passage was freely available at the time of the school district's posting in "December 2017[,]" 27 F.4th 313 at 319, remained true when Kiffin copied the WIN Passage on March 20, 2022. (Doc. 22 ¶ 36; Doc. 1-3.) When ruling on a motion to dismiss, a court cannot make that factual assumption that falls outside the four corners of the pleadings.

[Brief at 10].

This is the sort of too-clever-by-half argument which this court dislikes under any circumstances, but which it finds particularly distasteful within the context of plaintiff's ongoing abuse of the copyright litigation process. In so stating, this court takes judicial notice of the fact that anyone who visits plaintiff's website today can see the entire WIN Passage for free, at several different links on that site. *See, e.g.* https://winningisntnormal.com/product/w-i-n-12x18-poster-biker/. Moreover, plaintiff does not dispute that this was also the case when *Eagle Mountain* was decided. That being the case, it certainly stands to reason that Bell's website offered visitors free views of the WIN Passage at the time Kiffin made the tweet at issue in this case, and at no point in his briefing does plaintiff deny that this is the case. Plaintiff has instead chosen to take a coy "I'm not saying it is, but I'm not saying it isn't either" position on this issue, with which this court has little patience.

This court wishes to be clear that, based on plaintiff's prior litigation history, there is very good reason to suspect that this case is part of an ongoing scheme on his part to enrich himself by abusing the judicial process. This court is willing to give plaintiff an opportunity to persuade it otherwise, but he will not accomplish that with coy and disingenuous arguments. Quite to the contrary, the manner in which plaintiff makes these arguments, combined with the manner in which his factual allegations appear to change based upon his evolving view of what will allow him to recover, simply leads this court to conclude that this case is not, in fact, any different from *Eagle Mountain* or *Milwaukee* and that a common thread of bad faith runs through them all. This court therefore concludes that the third fair use factor is neutral, just as the Fifth Circuit did in *Eagle Mountain*. Moreover, this court's overall "scorecard" of these fair use factors is the same as the Fifth Circuit's in *Eagle Mountain*, and this supports reaching the same result as well. Finally, this court reiterates that, in this case, Kiffin also has a qualified immunity defense, which the defendant in *Eagle Mountain* did not.[1] This court finds it unnecessary to address this defense, but it notes that it constitutes an additional obstacle for plaintiff in this case, in the event that the Fifth Circuit should disagree with this court's finding that the fair use doctrine favors Kiffin.

Defendant's motion to dismiss this case will therefore be granted. Defendant has indicated that he may file a motion for attorneys' fees, and this court will therefore refrain from issuing the judgment in this case pending consideration of any such motion.

This, the 16th day of December, 2024.

---

[1] This is because qualified immunity is a defense which is only available to individual state or local officers, not institutions such as the defendant in *Eagle Mountain*. This court notes parenthetically that suing the University of Mississippi for copyright violations was not an option for plaintiff here, given that the Supreme Court has held that Eleventh Amendment immunity applies to such claims. *Allen v. Cooper*, 140 S. Ct. 994, 1000, 206 L.Ed.2d 291 (2020).

/s/ Michael P. Mills
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF MISSISSIPPI